# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **EDEN HOME, INC.** § | **CASE NO. 18-50608-cag-11** | |
| § | | |
| **Debtor.** § | | |

## DECLARATION OF LAURENCE P. DAHL
## IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF

**THE STATE OF TEXAS** §
§
**COUNTY OF COMAL** §

I, Laurence P. Dahl, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. My name is Laurence P. Dahl. I am over the age of eighteen years of age, and am fully competent to make this Declaration. I have never been convicted of a felony or crime of dishonesty or moral turpitude.

2. I am the Executive Director and Chief Executive Officer ("CEO") of Eden Home, Inc., dba EdenHill Communities ("Eden Home" or the "Debtor"), the debtor and debtor-in-possession in the above captioned case (the "Case"). I have served as the CEO of Eden Home for 17 years. I also have 33 years of experience in long term and acute care.

3. As the CEO, I am familiar with the operations of the Debtor and its books and records. I have personal knowledge of the facts stated herein, or such facts are based on my review of the Debtor's operations, including the Debtor's books and records, and on the

information and interview conducted by me and my staff and professional advisors with the Debtor's officers and employees.

4. I submit this Declaration in support of the various motions discussed below (the "First Day Motions") that the Debtor is filing on or shortly after the commencement of the Case on March 16, 2018 (the "Petition Date").

## I. BACKGROUND

### A. Debtor's History

5. Established in 1910, the Debtor has been serving the New Braunfels community and surrounding areas by providing quality senior healthcare and retirement housing since 1956. Prior to 2009 the Debtor was operated as Eden Home, Inc. The Debtor now does business as Eden Hill Communities.

6. The current campus was opened in 1956 in New Braunfels, Texas. While the Debtor has provided senior living and health care services for more than 100 years, it has not historically provided continuing care contracts and therefor was not subject to oversight and regulation by the Texas Department of Insurance.

7. In 2009, the Debtor began doing business as Eden Hill Communities. In 2013, the Debtor began offering continuing care contracts.

### B. Debtor's Non-Profit Status

8. The Debtor is a non-profit corporation. It is exempt from federal income tax as a charitable organization as described under section 501(c)(3) of the Internal Revenue Code of 1986, as amended. It is governed by a volunteer board of directors and officers (the "Board"), of which I am an ex officio member.

9. Eden Home is affiliated with the South Central Conference of the United Church of Christ (the "UCC") and its Council for Health and Human Services Ministries. However, the UCC is not in any way responsible for the financial and contractual obligations of Eden Home.

10. Eden Home has three affiliated non-profit organizations, (i) Eden-Cross Apartments, Inc. ("Eden-Cross"); (ii) Hilltop Pharmacy, Inc. ("Hilltop Pharmacy"); and (iii) Eden Heights, Inc. ("Eden Heights"). The Executive Committee of the Board ("Executive Committee") serves as the board for both Eden-Cross and Hilltop Pharmacy. The Eden Heights board is the Executive Committee plus two residents from the Eden Heights community. Each of these affiliated non-profit organizations is financially separate from the Debtor.

### C. Eden Home's Facilities and Services

11. Eden Home is located on approximately fifteen (15) acres on Lakeview Boulevard in New Braunfels, Texas. The original facilities were constructed on this property in 1956. Additional facilities were added in the 1970s and 1980s. In 2008, Eden Home added an additional eight cottages to the property. As discussed below, Eden Home added independent living apartments in 2013 and additional facilities in 2015.

12. As of the Petition Date, Eden Home offers the following facilities to its long-term and short-term residents:

   a. 103 Independent Living Apartment-Style Residences (the "Pinnacle"): The Pinnacle opened in 2013. The Pinnacle's apartments range in size from 713 to 1,849 square feet, with one and two bedroom configurations. Each apartment contains a full kitchen and one or two bathrooms. Prior to taking occupancy, residents of the Pinnacle must fund a deposit with Eden Home based upon the size of their unit. These deposits are refundable in amounts and or terms that vary by the size of the unit and the individual contract.

   b. 47 Independent Living Cottages (the "Cottages"): The Cottages are located in Eden Home's village (the "Village").

c. 37 Assisted Living Units ("Assisted Living"): The Assisted Living suites from 250 to 540 square feet, and include efficiency and one bedroom configurations. Each has a kitchenette and full bathroom.

d. 30 Memory Support Assisted Living Units ("Memory Support"): The units in Memory Support range from 287 to 353 square feet.

e. 184 Skilled Nursing Beds (the "Health Center"): Nursing care is provided to resident of the Health Center. It includes approximately sixty (60) private beds and one hundred twenty (120) semi-private beds. The semi-private suites are approximately 300 square feet. The new private suites are each approximately 286 square feet and include a full private bathroom. The newest part of the Health Center opened in 2015.

13. Residents at the Pinnacle receive a full-service package that includes food service, housekeeping, utilities,[1] a security and emergency and alert system, laundry, maintenance, mail, transportation, social and recreational programs, storage areas, wellness programming, a healthcare benefit, and other services. Cottage residents can elect a full-service package that is commensurate with that provided to residents of The Pinnacle.

14. With the exception of individuals at Eden Home's Health Center, all residents are charged a Monthly Service Fee based upon the services provided, the size of their unit and if the unit is occupied by more than one individual, as applicable.

**D. Eden Home's Bond Debt**

15. To finance and refinance a portion of the cost of the completion of the acquisition, construction, furnishing and equipping of the Pinnacle, a portion of the Health Center, and other improvements (the "Project"), Eden Home borrowed the proceeds of $52,550,000 in first mortgage revenue bonds (the "Bonds"), issued by Red River Health Facilities Development Corporation ("Red River") and loaned by Red River to Eden Home. The Bonds are evidenced

---

[1] The Monthly Service Fee charged to Pinnacle residents includes the costs of sewer, water, waste disposal, electricity, heat, air conditioning, internet and basic cable. The Monthly Service Fee charged to Village residents includes internet and basic cable. Residents at both locations are responsible for telephone and premium cable television.

by (i) that certain *Master Trust Indenture, Deed of Trust and Security Agreement* (as supplemented, the "Master Indenture"), dated as of February 1, 2012, between Eden Home and UMB Bank, N.A. (successor-in-interest to The Bank of New York Mellon Trust Company, National Association), as master trustee (the "Master Trustee"), and (ii) the *Indenture of Trust*, dated as of February 1, 2012, between Red River and the Master Trustee. The proceeds of the Bonds were loaned to Eden Home pursuant to the Loan Agreement (the "Loan Agreement"), dated as of February 1, 2012, between Eden Home and Red River. Pursuant to the Loan Agreement and the Master Indenture, the Bonds are direct obligations of Eden Home. Although the Bonds began to amortize in December 2016, no principal payments have been made, and therefore, the entire $52,550,000 principal amount remains outstanding, together with accrued and unpaid interest.

16. Eden Home's obligations under the Master Indenture are secured by a lien against, and security interest in, Eden Home's real and personal property, respectively, as described in the Master Indenture. Upon information and belief, the Master Indenture as originally drafted and as supplemented was properly recorded in the real property records for Comal County, Texas, thereby perfecting a lien on the real property pledged therein. Further, upon information and belief, a financing statement under chapter 9 of the Texas Business and Commerce Code relating to the security interests granted under the Master Indenture was also properly filed in the office in the Texas Secretary of State, perfecting those security interests in almost all of the Debtor's other property. In addition, pursuant a *Forbearance Agreement* dated November 13, 2015, the Debtor entered into deposit account control agreements with Bond Trustee, thereby creating perfected security interests in certain of the Debtor's deposit accounts at various third-party financial institutions, upon information and belief.

**DECLARATION OF LAURENCE P. DAHL IN SUPPORT OF FIRST DAY MOTIONS**  PAGE 5 OF 16

4851-2866-4670.8
ID\GERBER, JANE - 723813\000002

### E. Events Leading to the Bankruptcy Filing

17. In 2012, Eden Home contracted with J. E. Dunn Construction ("Contractor") for construction of the Project. Before the Project was completed, Eden Home discovered substantial defects in the construction. Efforts to correct the defective construction resulted in delays in the opening of the Project for occupancy and additional construction and renovation expenses to Eden Home. Eden Home is currently in litigation with the Contractor and Zurich American Insurance Company, which issued the builder's risk insurance policy, to recover its losses. *See J.E. Dunn Const. Co. v. Eden Home, Inc.*, Cause No. C-2015-0183D, pending in the 433rd Judicial District in Comal County, Texas (the "Construction Lawsuit"). Various counter-claims and third-party claims have also been raised in the Construction Lawsuit. Non-binding mediation with the Zurich American Insurance Company has been scheduled for March 16, 2018 in the Construction Lawsuit.

18. The loan documents evidencing the Bonds contain certain liquidity covenants, including a covenant to maintain cash above certain thresholds and a covenant to maintain cash levels above an established multiple of daily cash expenses. Following the construction delays, construction defects and attendant losses, Eden Home did not have sufficient liquid assets to meet these liquidity covenants. The lack of liquid assets has also impeded Eden Home's ability to effectively efficiently manage its cash for operations and to pay interest and principal due on the Bonds. Eden Home and the Master Trustee, on behalf of the holders of the Bonds, have entered into various forbearance agreements, which have included, among other concessions, a process for the sale, affiliation or refinancing transaction. Efforts to consummate that process have been hindered by the continuing presence of construction defects and the Construction Lawsuit. The forbearance agreements have expired by their terms and the Master Trustee has

indicated that the holders of the Bonds will imminently direct the Master Trustee to exercise remedies as a result of the existing defaults.

### F. Goal of the Bankruptcy Case and Proposed Plan of Reorganization

19. The Debtor's goal in this bankruptcy case is to maintain (i) the quality care it provides the residents and patients in its care, and (ii) the value of the Debtor's assets and enterprise while (a) finding new equity investors to support its operations, or (b) completing a sale process that ensures the superior care and treatment for Eden Home's residents and patients.

20. Because the Debtor's cash flow has struggled in the months leading up to the Petition Date, time is of the essence to avoid incurring administrative bankruptcy expenses to the greatest extent possible.

## II. FIRST DAY MOTIONS

### A. Complex Case Designation

21. The Debtor has also filed a Notice of Designation as a Complex Chapter 11 Bankruptcy Case, which I understand from my counsel is in accordance with the General Orders of the Court when commencing the contemplated complex case. I believe this designation is warranted because (a) the total claims asserted against the Debtor exceeds the $10 million threshold, (b) there are over fifty (50) creditors and parties in interest in this Case, and (c) the bonds are publicly traded. Based on these factors, I believe the Debtor is entitled to a complex chapter 11 case treatment of this Case, which will allow the Debtor and its counsel to use a limited service list, and set hearings on a more frequent basis. I believe such treatment will help the Debtor complete an effective and efficient restructuring through this Case without incurring unnecessary administrative costs or prejudicing the interests of creditors or parties-in-interest.

### B. Cash Collateral Motion

22. Debtor operates a senior care facility which is indebted to the bond trust in the principal amount of $52,550,000 plus accrued but unpaid interest. The Debtor has pledged its real and personal property to secure that debt. In order to continue its operations, Debtor needs access to its ordinary operating revenues and requests that pursuant to the budget attached to the cash collateral motion, its operations remain undisturbed.

### C. Employee Payroll and Benefits

23. Debtor's operations, by their nature, require an extensive labor force. Debtor employs over 300 persons at its New Braunfels campus, including medical staff, food preparation, physical plant maintenance, as well as employees dedicated to overhead functions such as billing and paying bills. The wages and benefits motion describes the payroll cycle, which is bi-weekly, the benefits components including 401(k), health insurance and other benefits. It is important to the care of the residents that these wages and benefits be maintained without interruption so that the Debtor can continue to provide appropriate services. The wages and benefits provided to the employees are market for the area and customary for this kind of facility.

### D. Cash Management Motion

24. The Debtor has also filed a motion to authorize it to continue using its existing bank accounts and cash management system (collectively, the "Cash Management System"). As discussed in greater detail in the Cash Management Motion, the nature of the Debtor's health-care business requires its business to operate seamlessly following the filing of its bankruptcy petition.

25. The Cash Management System ensures that the Debtor is able to submit and receive reimbursements for its services from Medicare and Medicaid as soon as these payments

4851-2866-4670.8
ID\GERBER, JANE - 723813\000002

are authorized. In addition, because the Debtor is a not-for-profit organization, several of its accounts are restricted. The Debtor's nine (9) bank accounts that make up the Cash Management System are listed as follows:

    a. Eden Home, Inc. Scholarship Account at Frost National Bank, Account #0604.[2]

    b. Eden Home, Inc. Resident Trust Fund Account at Wells Fargo Bank, N.A., Account #4953.

    c. Eden Home, Inc. Certificate of Deposit at Prosperity Bank, Account #0413.

    d. Eden Home, Inc. Account at Ameritrade, Account #3780.

    e. Eden Home, Inc. 401(k) Account at First Commercial Bank, N.A., Account #4218.

    f. Eden Home, Inc. Deposit Account – Pinnacle (Independent Living) at Broadway Bank, Account #3869.

    g. Eden Home, Inc. Operating Account at Broadway Bank, Account #3867.

    h. Eden Home, Inc. Fund Development Account at Broadway Bank, Account #3871.

    i. Eden Home, Inc. Payroll Account at Broadway Bank, Account #8639.

26. The Debtor also employs approximately 310 employees to operate its business and ensure its residents and patients receive superior care. It is important that the Cash Management System remain in place to ensure these individuals are timely paid.

27. The Cash Management System procedures the Debtor uses constitutes an ordinary, usual and essential business practice and are consistent with those used by other similar enterprises in the industry. The Cash Management System provides significant benefits to the Debtor, including but not limited to: (a) control funds centrally; (b) minimize idle cash; and (c)

---

[2] Each of the Bank Accounts described herein is identified by the last four digits of the account number.

reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance presentment information.

28. I have been advised that upon the filing of this bankruptcy case, the ordinary procedure is to close all preexisting bank accounts at unauthorized depositories and reopen new debtor-in-possession bank accounts at authorized depositories. The Debtor can do this, although doing so will cause the Medicaid and Medicare reimbursements to be delayed several weeks, if not longer. Without receiving immediate payments from these agencies, the Debtor's operations could be placed in jeopardy.

29. To alleviate any concerns, I will work with the Debtor's professionals to provide any reporting that the Court or the United States Trustee might require to show the flow of funds through the Debtor's account. Specifically, the Debtor will continue to maintain records of such accountings, including records of all current intercompany accounts receivable and payable, with balances existing as of and following the Petition Date.

### E. Utility Service Motion

30. Utility service is critical to the ongoing operations of Debtor's business. Any disruption of that service would be extremely detrimental to Debtor's business. A nonexclusive list of the utility companies whose services (the "Utility Services") that the Debtors enjoy is attached the utilities motion filed by the Debtors.

31. Prior to the Petition Date the Debtor has remained current in paying for their Utility Services. On average, the Debtors pay approximately $70,000 each month for third-party Utility Services, calculated as a historical average payment for the three-month period ended February 28, 2018. Accordingly, the Debtors estimate that their costs for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $70,000. One

utility company, Inviacom,[3] currently holds a deposit of approximately $11,400 belonging to the Debtor.

32. The Debtor has, or will have, adequate funds during the foreseeable future to pay for its post-petition Utility Services. In addition, the utility companies are further protected by their entitlement to an administrative expense priority under section 503 of the Bankruptcy Code for any unpaid post-petition Utility Services. In the event a utility company files a request for additional protections in accordance with the utilities motion, Debtors shall attempt to resolve that request consensually.

### F. Insurance Premium Installment Motion

33. The non-paid up insurance policies (the "Insurance Policies") maintained by the Debtor are as follows:

a) an excess employers indemnity policy with an effective date of January 29, 2018 and an expiration date of January 29, 2019 and a total yearly premium of $39,174.45 (the "EEI Policy")

b) a directors and officers/employment practices liability insurance policy with an effective date of May 19, 2017 and an expiration date of May 19, 2018 and a total yearly premium of $47,900 (the "D&O Policy"); and

c) an excess directors and officers/employment practices liability insurance policy with an effective date of May 19, 2017 and an expiration date of May 19, 2018 and a total yearly premium of $35,563 (the "Excess D&O Policy").

All of these Insurance Policies were financed by the IPFS Corporation (the "Premium Lender"). The Premium Lender has senior security interests in the proceeds of the financed Insurance Policies to the extent of any unpaid obligations owed by the Debtor. The total remaining amount owed on the financing for the EEI Policy as of the Petition Date is $27,401.43, and this financing

---

[3] The Debtor's current provider of internet and cable services for its residents is Digital Media. The Debtor's contract with Digital Media expires in July 2018. Inviacom will begin providing services to the Debtor in July and a portion of this deposit may be applied to the Debtor's bill once Inviacom's services begin.

carries interest at an effective annual percentage rate of 7.00%. The financing calls for ten more monthly payments of $3,134.09, due on the 29th day of each month. The total remaining amount owed on the financing for the D&O Policy and Excess D&O Policy as of the Petition Date is $13,184.73, and this financing carries interest at an effective annual percentage rate of 5.7%. The financing calls for two more monthly payments of $6,639.36, due on the 19th day of each month. While there may be a grace period allowed under the premium finance agreements before the policies can be cancelled, the Debtor may suffer irreparable harm if they do not obtain immediate relief to pay these Insurance Financing Obligations as they become due. If these payments are not made, the Premium Lenders may have the right under applicable non-bankruptcy law to cancel the Insurance Policies or the Insurance Policies may be automatically terminated. The Debtor must continue the Insurance Policies to preserve the value of its estate and to comply with various laws, regulations, and contract obligations that apply to the Debtor's assets and operations. Many of the Debtor's secured loan agreements require their assets to be insured, and failing to maintain that insurance could cause those lenders to obtain leave from the Court to foreclose on their assets before losses occur.

### G. Extension of Schedules & SOFA Deadlines Motion

34. The substantial size and complexity of Eden Home's operations complicates its ability to assemble and compile such information within the first 14 days of the Petition Date in an accurate, complete, and cost-effective manner Eden Home is efficiently staffed and has limited personnel available to review such information in the early stage of this Case, especially given the increased workload placed such personnel by the other requirements of the Case and Eden Home's situation. *Id*. The personnel and professional advisors who are needed to

complete the Schedules and SOFA must also devote time and attention to business operations to preserve and maximize the value of the Eden Home's going concern and bankruptcy estate.

H. **Motion to Pay Hilltop Pharmacy**

35. Hilltop Pharmacy operates from a location on Eden Home's campus. Hilltop Pharmacy is licensed by the Texas State Board of Pharmacy, license number 19280. In most instances, Hilltop Pharmacy provides pharmaceuticals and pharmaceuticals services directly to the residents of Eden Home and receives payments directly from those residents or their insurers, including Medicare. However, in other instances Eden Home obtains pharmaceuticals and other goods from Hilltop Pharmacy for Eden Home's business operations and pays Hilltop on a regular (usually monthly) basis for those goods. Hilltop Pharmacy in turn pays its pharmaceutical distributors for pharmaceuticals and also pays Hilltop Pharmacy's own operating expenses, including the salaries of its pharmacists and other personnel (which are approximately $21,000 per month). In addition, as Hilltop Pharmacy is a non-profit that serves Eden Home's residents on an essentially exclusive basis, Hilltop Pharmacy does not always break-even, so Eden Home from time to time funds Hilltop Pharmacy additional amounts to cover these operating expenses. There is not a formal written contract reflecting this agreement between Eden Home and Hilltop Pharmacy.

36. As of the Petition Date, Eden Home owed an unknown amount for pharmaceuticals and other goods provided to Eden Home prior to that time. This amount is unknown because the Hilltop Pharmacy will not have processed and provided to Eden Home all invoices all the pre-petition goods and services provided to Eden Home. The Debtor estimates that the unpaid amount owed to Hilltop Pharmacy for pre-petition goods and services as of the Petition Date is less than $25,000. Further, as of the Petition Date, Hilltop Pharmacy may be due

4851-2866-4670.8
ID\GERBER, JANE - 723813\000002

additional funds of up to $5,000 from Eden Home to cover small potential deficits in the operating budget of Hilltop Pharmacy pursuant to the unwritten agreement between Eden Home and Hilltop Pharmacy. These amounts are collective known as the "Hilltop Pre-Petition Claims."

37. If the Hilltop Pre-Petition Claims are not paid, Hilltop Pharmacy will not be able to pay its staff or pay its distributor for pharmaceuticals. These non-payments will likely result in Hilltop Pharmacy being forced to cease operations due to a lack of staff and a lack of pharmaceuticals to sell. This cessation of business by Hilltop Pharmacy could cause irreparable harm to Eden Home—Eden Home and its residents need the on-site pharmaceuticals and pharmacy services provided by Hilltop Pharmacy, and any replacement provider would be more expensive and risky to Eden Home than Hilltop Pharmacy. Along with the disruptions that would result if Hilltop Pharmacy needs to be replaced, there could be significant delays in obtaining different properly licensed provider. These disruptions and delays could cause significant further losses to Eden Home.

### I. Emergency Motion to Modify Stay to Permit Continuation of the Construction Lawsuit

38. In the Construction Lawsuit, non-binding mediation with the Zurich American Insurance Company has been scheduled for March 16, 2018. The automatic stay should be modified to permit the remainder of the Construction Lawsuit to proceed as normal so that the Debtor can liquidate and recover on the claims it asserts therein in a timely fashion. Discovery is ongoing and not complete in the Construction Lawsuit. The stay of discovery could delay the adjudication of the Construction Lawsuit, which is not in the best interest of the Debtor or its estate. Continuing discovery is necessary and the expenses and burdens of completing remaining

discovery to the Debtor and its estate are outweighed by the need to avoid further delay. The Construction Lawsuit also involves a mandamus proceeding initiated by one of the Debtor's adversaries regarding a discovery dispute in the underlying lawsuit. *See In re J.E. Dunn Const. Co.*, No. 03-18-00105-CV, pending in the Texas Third Court of Appeals. This matter has been fully briefed and only relates to production of documents by a non-debtor party. Permitting this matter to proceed as well on an expedited basis would be fair and would not risk harm to the Debtor or its bankruptcy estate.

### III. CONCLUSION

39. For the reasons provided above, and after due consideration it is my business judgment that the First Day Motions and related relief should be granted.

[Remainder of this page intentionally left blank; signature to follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, on this 16th day of March, 2018.

      */s/ Laurence P. Dahl*
      Laurence P. Dahl